UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:17-cr-00040-MOC-DSC

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| **ANTHONY LAMONT CALDWELL,** | ) | |
| | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the Court on defendant's Motion to Suppress and supplemental Motion to Suppress. Having considered defendant's motions and reviewed the pleadings, the Court enters the following Order consistent with its Order entered from the bench at the conclusion of the hearing.

## FINDINGS AND CONCLUSIONS

**I.  Factual Background**

At the suppression hearing, the government called Detective Eduardo A. Quevedo. He testified that a branch of Wells Fargo Bank located on Couloak Drive in Charlotte, North Carolina, was robbed on December 9, 2016, at 5:55 p.m. Witnesses to the robbery described the robbers as two African-American males wearing dark clothes and holding revolvers, one silver and one black. When the tellers placed their cash drawers on the counters, the robbers picked up a pack of currency containing a "GPS track pack." According to Detective Quevedo, the track pack alerts a security company when it is moved a certain distance, which in turn causes the security company to alert the local police of a robbery in progress.

1

Detective Quevedo testified that once the track pack was moved a certain distance, local authorities were alerted. In addition to alerting police of the in-progress robbery, the track pack gave police real time updates as to the location of the track pack. Police, using the coordinates provided, tracked the pack to the corner of Hunt Road and Susanna Drive, which is a mile or a mile and a half from the bank. Detective Quevedo testified that a responding officer arriving at the coordinates got out of his patrol car and walked towards Susanna Drive. At that point, the officer heard leaves rustling in a woods then saw individuals running across Hart Road. Another officer reported that he saw three individuals run across the road. The responding officer then gave chase on foot, but lost the suspects in the woods. Police then made a perimeter around the woods and called in K-9 and helicopter support.

After the perimeter was established and search dogs sent in, defendant was found hiding on top of a black bag containing a large amount of currency and the track pack was found in the black bag. Cross examination revealed that the K-9 unit had bitten defendant. In what Detective Quevedo described as a spontaneous utterance, defendant stated to the police that he was not a robber, but had been carjacked while trying to get a pizza from a store next to the bank. He said he was driving a silver Chevrolet Impala. Police located a silver Impala in the woods and observed from the exterior black clothing laying on the backseat and a black revolver and a ski mask on the ground near the trunk. Apparently, the car also had a fictitious license plate.

Detective Quevedo further testified that no search was done of the car at the crime scene, but that the car was seized and taken to the CMPD Law Enforcement Center. Later that evening officers sought a search warrant from a state magistrate. The warrant was issued that night and a search was conducted of the passenger compartment of the car. An inventory of items seized was completed and a return was made on the warrant early on the morning of December 10, 2016. The

trunk was apparently not searched because the battery was dead, making it impossible to open the trunk. Supplemental Response (#35) at 3.

The silver Impala was then moved from the LEC and taken to the CMPD impound lot. Some 12 days later on December 22, 2016, Detective Quevedo testified that he went to the impound lot and checked out the keys to the vehicle as well as a jump box so that he could then open the trunk. The detective testified that such inventory search of the trunk revealed additional clothing and a silver revolver found in a blue bag with a shark design, all of which the detective testified were consistent with items used in the robbery. Upon inquiry by the Court, the detective testified that CMPD has a policy that an inventory search will be conducted on all impounded vehicles.

In moving to suppress, defendant challenges the discovery of the items found in the trunk, arguing that the December 22 inventory search after the return of the search warrant on December 10 violated the Fourth Amendment and that the CMPD should have obtained a second warrant.

## II. Discussion

The Supreme Court has held that warrantless searches "are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." California v. Avecedo, 500 U.S. 565 (1991). The "automobile exception" was first recognized by the Supreme Court in Carroll v. United States, 267 U.S. 132 (1925). Under the automobile exception, "it may be reasonable and therefore constitutional to search a movable vehicle without a warrant, even though it would be unreasonable and unconstitutional to conduct a similar search of a home, store, or other fixed piece of property." United States v. Gastiaburo, 16 F.3d 582, 586 (1994) (citing Carroll at 153, 158-59). Police frequently if not routinely perform inventory searches when they detain suspects or automobiles. United States v. Hairston, 409 Fed.

Appx. 668, 670 (4th Cir. Jan. 27, 2011) (citing Illinois v. Lafayette, 462 U.S. 640, 648 (1983) (holding admissible evidence recovered during an inventory search of a shoulder bag possessed by a lawfully arrested person)). Inventory searches "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." Colorado v. Bertine, 479 U.S. 367, 372 (1987).

While it was not done here, it is clear that police could have searched the silver Impala as it sat in the woods on the night of robbery under the automobile exception. It is equally clear that they could have done an inventory search after the vehicle was seized and moved to the LEC. They decided, however, to seek issuance of a search warrant and conducted the initial search under the authority of that warrant, making a return early the next morning. Some 12 days later, they conducted an inventory search of the still impounded vehicle.

Defendant contends that the second search was unlawful under the Fourth Amendment. While the Court agrees with defendant that the challenged search followed an unusual trajectory, neither the delay in conducting the inventory search nor the securing of a search warrant in advance of an inventory search violate the Fourth Amendment. Indeed, the Court of Appeals for the Fourth Circuit has addressed a nearly identical argument:

> … Gastiaburo has noted that thirty-eight days transpired between the seizure of his car on October 8, 1991 and the warrantless search in question, and has argued that the delay violated the "temporal limit on the automobile exception" and that "it was a per se unreasonable delay." Gastiaburo's "delay" argument also lacks merit. Not a single published federal case speaks of a "temporal limit" to the automobile exception. The Supreme Court has repeatedly stated that a warrantless search of a car (1) need not occur contemporaneously with the car's lawful seizure and (2) need not be justified by the existence of exigent circumstances that might have made it impractical to secure a warrant prior to the search. Therefore, the passage of time between the seizure and the search of Gastiaburo's car is legally irrelevant.
> Moreover, Cosslett's actual "delay" here was minimal: he conducted the search on the very same day that he first had probable cause to believe contraband could be found behind the dashboard of Gastiaburo's car. Cosslett testified at the suppression hearing that, upon learning of the hidden compartment in Gastiaburo's

> dashboard, he proceeded "to the headquarters, obtained the keys from the evidence custodian, removed the vehicles [that were blocking in Gastiaburo's car], and checked the hidden compartment." Such an expeditious search cannot be deemed "per se unreasonable." Rather, it falls squarely within the specifically established and well-delineated "automobile exception" to the Fourth Amendment's warrant requirement

Gastiaburo, 16 F.3d at 586–87 (citations omitted). Neither the fact that it took Detective Quevedo 12 days to return to the impound lot nor the fact that a warrant was obtained on the night of the robbery suggest a Fourth Amendment violation.

The Court has also considered defendant's arguments for suppression under state law and finds those arguments equally unavailing. First, North Carolina General Statute §15A-249 applies the "knock and announce" requirement to searches of residences. It would be folly to hold that an officer has to knock and announce before searching a vacant automobile secured in a law enforcement center or an impound lot. Second, Sections 15A-225 and 15A-256 govern the frisk, detention and search of persons present during a vehicle or premises search. The evidence presented in this case clearly shows that the vehicle searched was not a residence and that no person, other than authorized law enforcement officers, were present during either search. While not argued, whether or not a seizure of evidence violates state law is irrelevant to the determination of a motion to suppress in federal court. United States v. Van Metre, 150 F.3d 339, 347 (4th Cir. 1998); United States v. Clyburn, 24 F.3d 613, 616 (4th Cir. 1994) (holding "evidence admissible under federal law cannot be excluded because it would be inadmissible under state law."). Moreover, there simply is no Fourth Amendment requirement that officers searching an impounded vehicle inform either the owners or recent occupants of an impending search.

In addition, the Court has liberally read defendant's memoranda and listened to the arguments of his counsel. Defendant may well be arguing that by obtaining a search warrant the police somehow waived or forfeited their ability to later inventory the vehicle when it arrived at

the impound lot. The Court cannot find any case law that would support that theory. In addition, such a theory, if adopted by courts, would penalize the police for being exceptionally careful in the early stages of an investigation. Not unlike the situation in Gastiaburo, police can later develop information that will cause them to go back and look in places they did not think to look before while the vehicle is still impounded. Further, unforeseen circumstances such as a dead battery may make search of electronically controlled compartments impossible or impractical during an initial search be it with a warrant or for inventory. In this case, it appears that the police wanted to search the trunk on the night of the robbery, but were unable to do so because the battery was dead, which prevented them from remotely opening the trunk lid. While the police could have justifiably pried open the trunk under the warrant, it appears that CMPD elected not to harm the vehicle and made their return. The fact that they did not conduct an inventory search until 12 days later (or figure out that they could do an inventory search), does not raise Fourth Amendment concerns.

As there is no constitutional interest served in penalizing law enforcement for being overly protective of defendant's rights in the early stages of the investigation, this court can also see no reason for penalize the police for being careful not to damage a car in the process of a search.

**ORDER**

**IT IS, THEREFORE, ORDERED** that defendant's Motion to Suppress (#27) and supplemental Motion to Suppress (#34) are **DENIED** for the reasons stated at the conclusion of the January 16, 2018 hearing and, further, for the reasons herein stated.

Signed: January 18, 2018



Max O. Cogburn Jr
United States District Judge

6